IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RAUL MARTINEZ PEREZ, et al.,

    Plaintiffs,

    v.                                    CIVIL NO. 01-2596 (RLA)

HYUNDAI MOTOR COMPANY, et al.,

    Defendants.

## ORDER IN THE MATTER OF OUTSTANDING MOTIONS

This is an action for damages involving an automobile accident which resulted in the death of ALBA MARTINEZ-PEREZ and injuries to her minor son. According to the complaint, while decedent was driving a Hyundai motor vehicle owned by her brother, plaintiff RAUL MARTINEZ-PEREZ, and manufactured by the defendant an oncoming car invaded her lane and impacted the Hyundai in a partial head-on collision. Plaintiffs charge that the driver's death as well as her son's injuries were due to the vehicle's supplemental restraint system (SRS) of air bags failure to deploy.

Present before the court for disposition are three motions filed by the parties which we will address *seriatim*. These are: defendant's motion for summary judgment due to spoliation of evidence, plaintiffs' motion in limine to strike the testimony of ROBERT RESCH and defendant's motion for summary judgment for lack of adequate causation.

### I. SUMMARY JUDGMENT

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that

CIVIL NO. 01-2596 (RLA)                                    **Page 2**

they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-61 (1st Cir. 2000); Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). A fact is material if it might affect the outcome of a lawsuit under the governing law. Morrissey v. Boston Five Cents Sav. Bank, 54 F. 3d 27, 31 (1st Cir. 1995).

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004) (citing Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir.1995)).

Credibility issues fall outside the scope of summary judgment. "'Credibility determinations, the weighing of the evidence, and the

CIVIL NO. 01-2596 (RLA)                                        **Page 3**

---

drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). *See also*, Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments."); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999) ("credibility determinations are for the factfinder at trial, not for the court at summary judgment."); Perez-Trujillo v. Volvo Car Corp., 137 F.3d 50, 54 (1st Cir. 1998) (credibility issues not proper on summary judgment); Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F.Supp.2d 108, 113 (D.P.R. 2002). "There is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." Cruz-Baez v. Negron-Irizarry, 360 F.Supp.2d 326, 332 (D.P.R. 2005) (internal citations, brackets and quotation marks omitted).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, Anderson v. Liberty Lobby, Inc., 477

CIVIL NO. 01-2596 (RLA)                                        **Page 4**

U.S. at 256-257, 106 S.Ct. 2505, 91 L.Ed.2d 202; <u>Navarro v. Pfizer</u>
<u>Corp.</u>, 261 F.3d 90, 94 (1st Cir. 2000); <u>Grant's Dairy v. Comm'r of</u>
<u>Maine Dep't of Agric.</u>, 232 F.3d 8, 14 (1st Cir. 2000), and cannot rely
upon "conclusory allegations, improbable inferences, and unsupported
speculation". <u>Lopez-Carrasquillo v. Rubianes</u>, 230 F.3d 409, 412 (1st
Cir. 2000); <u>Maldonado-Denis v. Castillo-Rodríguez</u>, 23 F.3d 576, 581
(1st Cir. 1994); <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d
5, 8 (1st Cir. 1990).

## II. SPOLIATION OF EVIDENCE

HYUNDAI has moved the court to either dismiss the complaint or
in the alternative, to preclude plaintiffs from presenting evidence
predicated on their expert's inspection of the vehicle involved in
the crash claiming plaintiffs are responsible for the spoliation of
the car's airbag module system. Defendant claims that the
unavailability of this piece of evidence has prejudiced its capacity
to defend in this action.

"Spoliation refers to the destruction or material alteration of
evidence or to the failure to preserve property for another's use as
evidence in pending or reasonably foreseeable litigation." <u>Silvestri</u>
<u>v. Gen. Motors Corp.</u>, 271 F.3d 583, 590 (4th Cir. 2001).

Litigants have the responsibility of ensuring that relevant
evidence is protected from loss or destruction. "'A litigant has a
duty to preserve relevant evidence.'" <u>Perez-Velasco v. Suzuki Motor</u>

Co. Ltd., 266 F.Supp.2d 266 (D.P.R. 2003) (citing Vazquez Corales v. Sea-Land Serv., Inc., 172 F.R.D. 10, 11-12 (D.P.R. 1997)).

Further, this obligation predates the filing of the complaint and arises once litigation is reasonably anticipated.  The duty extends to giving notice if the evidence is in the hands of third-parties.  "'The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation... If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence.'" Perez-Velasco, 266 F.Supp.2d at 268 (citing Silvestri, 271 F.3d at 591).

### Relevant evidence

Relevant evidence is that which may disprove plaintiff's liability theory. Perez Velasco. "It is plainly obvious that evidence with the potential to disprove a plaintiff's theory or to reveal a contributing cause of damages for which the defendant is not responsible is relevant to the case." Vazquez Corales, 72 F.R.D. at 12.

If the court finds that a party is accountable for the spoliation it may impose sanctions to avoid unfair prejudice to the

opposing party. "[T]he district court has inherent power to exclude evidence that has been improperly altered or damaged by a party where necessary to prevent the non-offending side from suffering unfair prejudice.'" Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 28 (1st Cir. 1998) (citing Sacramona v. Bridgestone/Firestone, Inc., 106 F.3d 444, 446 (1st Cir. 1997)); Silvestri, 271 F.3d at 590.

Prejudice will be measured by the degree in which defendant's "ability to mount an adequate defense" has been hampered. Perez-Velasco, 266 F.Supp.2d at 269. See also, Driggin v. Am. Sec. Alarm Co., 141 F.Supp.2d 113, 121 (D.Me. 2000) (severity of prejudice in "ability to develop a defense"); Vazquez-Corales, 172 F.R.D. at 14 (prejudice in that defendant was prevented from developing alternative theories as to the cause of the accident).

Applicable caselaw in the First Circuit has clearly established that "bad faith or comparable bad motive" is not required for the court to exclude evidence in situations involving spoliation. Trull v. Volkswagen of America, Inc., 187 F.3d 88, 95 (1st Cir. 1999).

The measure of the appropriate sanctions will depend on the severity of the prejudice suffered. However, the court must also consider "whether the non-offending party bears any responsibility for the prejudice from which he suffers." Driggin, 141 F.Supp.2d at 121. "Fairness to the opposing party... plays a substantial role in determining the proper response to a spoliation motion, and punishment for egregious conduct is not the sole rationale for the most severe sanction of exclusion." Trull, 187 F.3d at 95.

In view of the general policy that cases be tried on their merits, dismissal as a sanction for spoliation is a harsh measure reserved only for extreme situations. Collazo-Santiago, 149 F.3d at 28; Driggin, 141 F.Supp.2d at 123; Vazquez-Corales, 172 F.R.D. at 13. "The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth." Silvestri, 271 F.3d at 590. "The intended goals behind excluding evidence, or at the extreme, dismissing a complaint, are to rectify any prejudice the non-offending party may have suffered as a result of the loss of evidence and to deter any future conduct, particularly deliberate conduct, leading to such loss of evidence... Therefore, of particular importance when considering the appropriateness of sanctions is the prejudice to the non-offending party and the degree of fault of the offending party." Collazo-Santiago, 149 F.3d at 29; Driggin, 141 F.Supp.2d at 120. "But even when conduct is less culpable, dismissal may be necessary if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case." Silvestri, 271 F.3d at 594. See also, Flury v. Daimler Chrysler Corp., 427 F.3d 939, 943 (11th Cir. 2005). ("This case hinges upon the significance of the evidence destroyed, and upon the extreme prejudice the defendant suffered as a result. Although the district court is afforded a considerable amount of discretion in imposing sanctions, we believe the extraordinary nature of plaintiff's actions coupled with extreme prejudice to the defendant warrants dismissal.")

CIVIL NO. 01-2596 (RLA)                                              Page 8

Whether plaintiff is claiming a design defect rather than a manufacturing defect may be relevant for the court to evaluate the degree of prejudice to the opposing party.[1] "Clearly, if a product was manufactured defectively, its defect is likely to be particular to the individual product. Consequently, a party's examination of that product may be critical to ascertaining, among other things, the presence of the defect. In design defect cases, however, a party's examination of the individual product at issue may be of lesser importance as the design defect alleged can be seen in other samples of the product. Nevertheless, examination of the individual product in question may still be of significant import in certain design defect cases where, for example, the question whether the alleged defect or some other factor caused a particular injury is at issue." Collazo-Santiago, 149 F.3d at 29. See also, Perez-Velasco, 266 F.Supp.2d at 268-9 (in manufacturing defect case preserving the vehicle is "of utmost relevance").

Sanctions for spoliation range from dismissal of the action, exclusion of evidence or testimony or instructing the jury on a negative inference to spoliation whereby jury may infer that party that destroyed evidence did so out of realization that it was

_____

[1] Plaintiffs object to defendant's statement that this action arises from a manufacturing defect and not from a manufacturing design. However, it is evident from the arguments raised by plaintiffs in this litigation as well as the opinion of plaintiffs' expert, DR. GALDOS, that their claim is one for a manufacturing defect and not for an improper airbag system design.

unfavorable. Driggin, 141 F.Supp.2d at 120; Vazquez-Corales, 172 F.R.D. at 13 and 15.

### The Facts

The court finds that for purposes of this motion the following facts are not in dispute.

On November 25, 2000 ALBA MARTINEZ was driving a 1996 Hyundai Accent manufactured by the defendant when another vehicle driven in the opposite direction invaded her lane causing the Hyundai to sustain a severe impact.

The vehicle driven by decedent had been purchased by her brother, plaintiff RAUL MARTINEZ-PEREZ, in June 1996.

The parties agree that even though the forces generated by the aforementioned impact exceeded the threshold required for airbag deployment the airbags failed to deploy.

On or about December 14, 2000 plaintiff RAUL MARTINEZ-PEREZ assigned his rights over the crashed vehicle to his insurer.

On March 8, 2001 the vehicle was sold by the insurer at public auction to JUNKER MARIANO in San Sebastian, a town located on the central western part of Puerto Rico.

On September 10, 2001 the vehicle was inspected at JUNKER MARIANO by DR. RICARDO GALDOS, plaintiffs' expert. Plaintiff RAUL MARTINEZ-PEREZ and counsel VILMA DAPENA were also present that day. According to the deposition testimony of MR. MARTINEZ-PEREZ at that time the vehicle's air bags had already been removed from the

**CIVIL NO. 01-2596 (RLA)**                                    **Page 10**

vehicle.   In   his   deposition   MR.   MARTINEZ-PEREZ   related   the

circumstances surrounding the visit as follows:[2]

> Q.  When you went to the junker irrelevant (sic) with Mr.
>
>     Galdos, were the air bags still in the car?
>
> A.  They had been removed.
>
> Q.  Do you know who removed them?
>
> A.  I understand it was the junker's employee.
>
> Q.  Do you know what happened to them?
>
> A.  Yes. They have them there at the storage.
>
>                                    . . . .
>
> Q.  Did someone tell you at the junker that the air bags were
>
>     in storage?
>
> A.  I believe an employee told Galdos and the person who was
>
>     with us.
>
> Q.  And the person was the attorney?
>
> A.  Attorney Dapena and Ruben Gonzalez.

According to plaintiffs, MR. MARTINEZ-PEREZ returned to the

junker the following day, September 11, 2001 along with a friend

named RUBEN GONZALEZ upon instructions from counsel DAPENA "[b]ecause

the cars that were damaged in that condition... were going to be

destroyed".[3] MR. MARTINEZ-PEREZ further explained that the purpose of

---

[2] Deposition Tr. 125-27.

[3] Deposition Tr. 131.

CIVIL NO. 01-2596 (RLA)                                              **Page 11**

visit was for RUBEN GONZALEZ to advise the owner of the junker "[t]hat the unit had to be retained for this legal suit."[4]

Thereafter, plaintiffs instituted this action on November 21, 2001. On January 16, 2002 counsel DAPENA forwarded opposing counsel copy of the complaint filed in this case. The transmittal letter invited defendant's attorney to meet on February 20, 2002 to discuss the possibility of settlement and urged defendant to accept waiver of summons.

In a letter dated February 11, 2002 MS. DAPENA inquired as to defendant's decision regarding the proposed February 20, 2002 meeting as well as the waiver of summons. Counsel further reminded defendant's attorney that the vehicle in question was available for inspection and alerted him to possible risks. In pertinent part, the letter specifically noted.

> Lastly, during our phone conversation I expressed to you that the vehicle object of this litigation is available for inspection by your client. Please let me know whether you are interested in examining the vehicle in order to make the proper arrangements. This is of extreme importance in order to prevent any unforeseen event later on.

Plaintiffs' Motion Tendering Exhibits (docket No. 190) Exh. 11.

On March 18, 2002 defendant's counsel responded indicating that his client was interested in inspecting the vehicle and that Hyundai

---

[4] Deposition Tr. 132.

representatives would be arriving for that purpose during the first week of April. Plaintiffs were admonished of their duty to preserve the vehicle. Counsel also indicated that Hyundai would not be waiving service of summons in this case.

On April 3, 2002 defendant confirmed the arrangements for inspecting the vehicle on April 11, 2002. Defendant finally carried out the vehicle's inspection on April 10, 2002 in the presence of plaintiffs' counsel and subsequently purchased the vehicle from JUNKER MARIANO on August 8, 2002.

However, defendant has not been able to inspect the airbag system nor is there a clear explanation of its whereabouts.[5]

### Prejudice

Defendant contends that its inability to fully investigate the true reason why there was no airbag deployment has hampered its capacity to defend "leaving [defendant] with less than a complete or 'thorough' defense."  Defendant's Reply Statement (docket No. 204)

---

[5] Plaintiffs intimate that the airbags may have disappeared while the vehicle was in defendant's custody. We find there is no evidence to support such an inference. Plaintiff RAUL MARTINEZ-PEREZ concedes that during his visit on September 10, 2001 the airbags had already been removed and were purportedly stored in the junker's offices. On the other hand, the first time that defendant had access to the vehicle was at the April 10, 2002 inspection in the presence of plaintiffs' counsel and there is no reliable evidence to suggest that the airbags were in the vehicle at the time. All that plaintiffs have submitted in support of their theory is the affidavit of the owner of the junker who merely indicated that he did not have evidence of having sold the airbags. Neither does the affidavit indicate that these were sold/delivered to defendant. According to the affiant, the price of the airbags was approximately $400.00 to $500.00.

p. 12. Specifically, HYUNDAI argues that it was deprived of the opportunity to refute plaintiff's manufacturing defect claim in that it was not able to determine: (1) if there was indeed an airbag in the vehicle at the time of the accident and, if so, (2) whether or not it was the original airbag, and, if so, (3) whether it had previously deployed. I.e., whether the airbag had been removed, replaced or deployed prior to the accident.

Defendant contends that there is a strong probability that the original airbag had deployed in some prior incident and was either removed, replaced or simply refolded and put back in the module without changing the ECU. According to defendant this cannot be established, however, without examining the airbag.

Defendant's argument is based on the examination of the Hyundai Accent airbag system conducted on or about September 19, 2003 by SIEMENS VDO AUTOMOTIVE AG (SIEMENS), the designer and developer of the electronic control unit (ECU), whereupon the memory in the ECU was downloaded. The deposition *de bene esse* of ROBERT RESCH, a SIEMENS employee, was taken on December 13, 2004.  According to MR. RESCH the purpose of the ECU is to measure and evaluate accelerations and, depending on the accelerations, to determine whether or not the airbag should ignite. The ECU stores data in its memory and this data can be retrieved. Once a vehicle has been involved in a deployment event and the ECU sends a signal to deploy the airbag, the ECU records no future data after that particular event. That is, the ECU can record only one crash in its memory.  In his deposition MR. RESCH

CIVIL NO. 01-2596 (RLA)                                      **Page 14**

indicated that the data contained in the ECU revealed that an accident was registered at 903 hours and 45 minutes.

Based on the information provided by MR. RESCH, defendant's expert, ROBERT RUCOBA, opined that inasmuch as the mileage on the vehicle at issue was 56,565 miles, "[i]f the signal to deploy the airbag system was from this crash, the vehicle would have been driven at an average speed of 62 miles per hour over its lifetime. Given the 'urban' nature of the island traffic this average speed is highly unlikely. Because the airbag system is a 'one time' deploy system, it is more likely that the airbag was fired at a point in time earlier than the point in time when Ms. Martinez-Perez had her fatal crash."

Additionally, defendant's expert witness JAMES V. BENEDICT, Ph.D., MD. provided various alternate explanations for the airbag's failure to deploy on the date of the accident object of this litigation.  One possible reason was that there had been a previous deployment and the airbags had been either removed and the module sealed again or the airbags had been "folded back in and the cover closed".[6] DR. BENEDICT noted that in his experience he was personally aware of at least four or five instances where this had been done.[7] Additionally, DR. BENEDICT noted that in the event of a prior deployment had the diagnostic module not been replaced, the airbags would not deploy in a subsequent accident even if the airbags had

---

[6]  Deposition Tr. 125.

[7]  *Id.* at 126-27.

CIVIL NO. 01-2596 (RLA)                                        Page 15

been replaced. Further, he noted that replaced airbags would not deploy if they were "not hooked properly".[8]

### Discussion

Even though we agree with defendant that there is a duty to preserve relevant evidence, in this particular case it is doubtful that the vehicle's owner, RAUL MARTINEZ-PEREZ, had the economic resources to disburse the $4,049.00 required under the insurance policy in exchange for payment of his loss to retain title to the wrecked vehicle. What defendants deem "nominal expense" is relative to the economic situation of each individual. Accordingly, it is apparent that MR. MARTINEZ-PEREZ did not have much choice over the vehicle's assignment to its insurer and the resulting loss of control over the airbags.

Defendant further argues that the vehicle was not properly stored and had seriously deteriorated by the time it was inspected. However, there is evidence that plaintiffs did take steps "to preserve the integrity of the vehicle" prior to being purchased by defendant.[9] However, neither plaintiffs nor their representatives had control over the vehicle and hence, did not participate in the safeguard mechanism decisions. Plaintiffs did, however, take reasonable steps to alert the junkyard, the legal owner of the vehicle, as to the need to preserve the car.

---

[8] Deposition Tr. 129.

[9] Plaintiffs' Memorandum (docket No. 184) p. 1.

In this regard, the evidence shows that at the time of the inspection 10 months after the accident, plaintiff RAUL MARTINEZ-PEREZ and his representatives observed that the airbag modules had been removed from the vehicle. In response to their inquiry they were advised by junker personnel that these were on storage in the premises. Albeit no specific indications regarding the airbags were given to the junkyard, there was a clear intention on plaintiff's part to take steps to have the evidence safeguarded by its rightful owner.

We also find that defendant's delay in procuring this particular evidence also contributed to the disappearance of the airbags. Plaintiffs were made aware of the suit in January 2002 and it was not until April of that year that defendant finally inspected the vehicle. Another four months elapsed before it purchased the same.

Lastly, in view of our ruling striking the testimony of MR. RESCH the severity of the alleged prejudice claimed by defendant vanishes. Thus, we do not find that under the circumstances present in this case HYUNDAI will suffer extraordinary prejudice in mounting its defense to plaintiffs' strict liability claim.

### Conclusion

Accordingly, defendant's Motion for Summary Judgment due to Plaintiffs' Spoliation of Evidence (docket No. **181**) is **DENIED**.[10]

---

[10]    *See also*, HUNDAI's Memorandum of Law (docket No. **179**); Plaintiffs' Memorandum in Opposition (docket No. **184**); Plaintiffs' Opposing Statement of Contested and Uncontested Facts (docket No.

### III. MOTION IN LIMINE RE: ROBERT RESCH

Plaintiffs have moved the court to exclude the testimony of ROBERT RESCH listed by defendants as a fact witness claiming that his proffered testimony is that of an expert witness.[11]

#### Background

ROBERT RESCH ("RESCH") is a physicist employed by SIEMENS VDO AUTOMOTIVE AG ("SIEMENS"), a non-party German corporation that designed and developed the electronic control unit ("ECU")in the Hyundai vehicle involved in the accident at issue in this litigation. The ECU is one of the components of the vehicle's airbag system. It records the hours of operation of the airbag sensor. SIEMENS did not manufacture the ECU nor did it develop any other parts of the airbag system.

RESCH has been employed by SIEMENS for the past seven years in the quality area analyzing airbag control devices in situations where

185); Plaintiffs' Motion Tendering Exhibits (docket No. 190); Plaintiffs' Motion Tendering Exhibits (docket No. 191); Defendant's Reply (docket No. 203); Defendant's Reply Statement (docket No. 204); Plaintiffs' Sur-Reply Memorandum (docket No. 213); Plaintiffs' Sur-Reply Statement of Contested and Uncontested Facts (docket No. 214); Motion Supplementing Plaintiffs' Memorandum of Law (docket No. 217); Motion to Strike and/or Opposition to Plaintiffs' Supplemental Motion (docket No. 218); Motion in Opposition to Defendant's Motion to Strike (docket No. 221); Motion to Strike Defendant's Opposition (docket No. 222); Response to Plaintiffs' Motion to Strike (docket No. 223); Informative Motion Requesting Judicial Notice (docket No. 224) and Opposition to Defendant's Informative Motion (docket No. 225).

[11]   RESCH was never timely identified as an expert witness in this case.

there were allegations of malfunction. In his deposition MR. RESCH indicated that he had performed "several hundreds" of these analyses.[12]

On September 19, 2003 RESCH came to Puerto Rico from Germany at the request of the defendant and after inspecting the aforementioned ECU with the assistance of THOMAS WERNICKE, a SIEMENS electronic specialist, downloaded to a computer the information contained in the ECU in the presence of representatives for both parties to this litigation. This entire process was photographed.

The data from the ECU was interpreted by SIEMENS software and then appeared on the computer screen visible to the parties in attendance. It revealed that a crash was recorded in the memory of the ECU at 903 hours and 45 minutes since the airbag sensor had been in operation.[13]

Subsequently, on October 10, 2003 RESCH and DR. GERHARD MADER, also from SIEMENS, prepared an EEPROM[14] analysis report which included (1) a description of the status of the vehicle, (2) the download procedure followed, (3) the EEPROM analysis results, and (4) a conclusion. This report was addressed to SIEMENS' attorneys in

---

[12]   Deposition Tr. 53.

[13]   *Id*. 81-82.

[14]   EEPROM is an abbreviation for the ECU memory - it means electrically erasable programmable read only memory. Deposition Tr. 75.

CIVIL NO. 01-2596 (RLA)                                    **Page 19**

Chicago with copy to counsel for defendant. Plaintiffs were provided copy thereof as part of the discovery process.

RESCH's *bene esse* videotaped deposition was taken on December 13, 2004 in Chicago subject to plaintiffs raising their objections regarding the scope of his testimony via a motion in limine.[15]

In his deposition RESCH explained the vehicle's condition at the time and the steps taken to retrieve the data from the ECU. He further testified that he was familiar with the SIEMENS procedure used to download data and that he personally observed how the data stored in the ECU was downloaded on September 19, 2003. He also noted the content of the ECU memory as displayed on the computer screen which was shown to those present as well as photographed. The data as appearing on the computer screen clearly indicated that an accident had been registered at 903 hours and 45 minutes of operation of the airbag sensor.

According to defendant, RESCH is a fact witness called to testify on his personal observations to assist the trier of fact in understanding: (1) how the ECU functions, (2) how the data was downloaded from the ECU, and (3) what data was contained in the ECU of the vehicle subject to the complaint. Specifically, defendant contends that RESCH can testify as to his personal perception in the aforementioned three areas, i.e., how the ECU works, what he saw at

---

[15]    *See*, Minutes of Status/Settlement Conference held on March 24, 2004 (docket No. 132).

CIVIL NO. 01-2596 (RLA)                                          **Page 20**

the time the ECU memory data was downloaded and what that data contained.

Defendant argues that these are all factual observations devoid of opinion or inference and that the witness merely described what he saw. Defendant characterized it as "[t]estimony based on personal observations of the ECU memory being downloaded and the data gleaned therefrom on September 19, 2003."[16]

Plaintiffs, on the other hand, contend that the proffered testimony is not factual nor based on personal observations of ordinary people but rather that RESCH had to perform a test to interpret the ECU results. It is plaintiffs' position that an average person cannot download stored data or interpret it. In sum, that the method as to how the ECU operates, how it records the data, and how MR. RESCH obtained the results is not testimony that a lay person can provide under Rule 701.

In his deposition RESCH testified that the purpose of the ECU is to measure car accelerations and depending on those accelerations, the ECU decides on whether or not to send a signal to fire an airbag. The decision on whether or not to ignite is made by the software which uses an algorithm. The input for the software is an accelerometer.

_____

[16]   Defendant's Opposition (docket No. 172).

CIVIL NO. 01-2596 (RLA)                                      Page 21

RESCH also stated that an ECU can only record one airbag deployment event. Once the ECU sends a signal to fire an airbag the ECU needs to be replaced.

RESCH further noted that the ECU has a memory which stores data when the electricity is turned off.  This data remains stored in the memory unless it is erased. Further, this data is not encrypted but rather is stored in "hexadecimals" and is interpreted by a particular software which allows it to be read. In other words, the stored data can be called out with a laptop computer programed with a SIEMENS' software to interpret it.

According to the deponent the ECU has an internal clock ("OTC") which only works when the car ignition is on. It records the period of time during which electricity is sent to the ECU. At the September 19, 2003 inspection the software interpreted the operating time on the OTC as of the time of the crash as recorded in the memory at 504 hours 0 minutes.[17] This figure "indicates the time during which the ECU was on."[18]

Further, RESCH noted that the ECU stops recording if the vehicle has been involved in a crash. "The time continues to run; but when a crash is registered, other functions discontinue."[19] "The ECU stops

---

[17]    However, RESCH explained that when manually tested again at the office he noted that the OTC time was 15 minutes earlier, i.e., 903 hours with 45 minutes instead.

[18]    Deposition Tr. 29.

[19]    *Id.* 31.

CIVIL NO. 01-2596 (RLA)                                    **Page 22**

all functions except for the counting of time."[20] Additionally, the "fault memory" records the time when a particular vehicle deficiency such as low battery and warning light is noted.[21] "A crash was recognized by the ECU at the point in time of 903 hours and 45 minutes."[22]

The mileage appearing on the vehicle odometer at the time of the accident was 56,565.[23]

**The Law**

Rule 701 Fed. R. Evid. allows for opinion testimony by lay witnesses provided these are grounded on their personal observations, assist in comprehending their testimony or a factual issue in the

---

[20]   Deposition Tr. 31.

[21]   *Id.*

[22]   *Id.* 39.

[23]   The purpose of having RESCH testify on this particular matter is for defendant to raise the specter of a prior crash during trial due to the unavailability of the airbag modules for inspection. According to defendant RESCH would not be asked to render an opinion on this matter. Rather, this information would be used to support defendant's expert RUCOBA's conclusion that "it is more likely that the airbag was fired at a point in time earlier" than the fatal crash involved in this case. RUCOBA's November 18, 2003 Report ¶ 4. According to the report, dividing the vehicle's mileage at the time of the accident by the time recorded in the ECU memory means that "the vehicle would have been driven at an average speed of 62 miles per hour over its lifetime [and] [g]iven the 'urban' nature of the island traffic this average speed is highly unlikely." *Id.*

CIVIL NO. 01-2596 (RLA)                                    **Page 23**

case and are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."[24]

On the other hand, Rule 702 governs the use of expert witnesses[25] which, pursuant to Rule 26(a)(2) Fed. R. Civ. P. must be timely identified and their opinions disclosed by way of a particularized report. "[T]he purpose of [Rule 26] is to give parties a reasonable opportunity to prepare an effective cross-examination of the opposing

---

[24] Rule 701 reads:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

This last provision was included by way of an amendment in 2000.

[25] Rule 702 reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

parties' expert witness and, if necessary, arrange for testimony from other experts." 6 Moore's Federal Procedure § 26.23[2][a][i].

Experts testifying under Rule 701 are not subject to the disclosure and reporting requirements of Rule 26.

Rule 701 was amended in 2000 to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 701 advisory committee's note.

Therefore, if "any *part* of a witness' testimony... is based upon scientific, technical, or other specialized knowledge [it falls] within the scope of Rule 702 [and] is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules." *Id*. (italics supplied).

In reaching its decision as to whether a particular testimony falls within the scope of Rule 701 or 702 the court should examine the nature of the thought process behind the particular opinion or inference at issue.

> [T]he 2000 amendment to Rule 701 is intended to induce the courts to focus on the reasoning process by which witnesses reached their opinions; the courts are to

**CIVIL NO. 01-2596 (RLA)**                                        **Page 25**

determine whether the proffered testimony should be analyzed under Rule 701 or Rule 702 by ascertaining whether the witness used a reasoning process normal to the activities of everyday life. The express language of the amendment seems to suggest that, if the witness's opinion rests in any way upon scientific, technical, or other specialized knowledge, the court should analyze the admissibility of the testimony under the rules applicable to expert testimony rather than those applicable to lay opinion testimony.

Weinstein's Federal Evidence § 701.03[1] (footnotes omitted).

The advisory committee cited with approval the distinction between lay and expert witnesses testimony made in <u>State v. Brown</u>, 836 S.W.2d 530, 549 (1992) wherein the court noted that "lay testimony 'results from a process of reasoning familiar with everyday life' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'"

It is important to note that the background of the particular witness is not the decisive factor. "The amendment does not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*." Rule 701 advisory committee note (italics in original).

Further, Rule 701 requires that the testimony be based on the personal experience of the witness regardless of the professional

qualifications. "Such testimony is not based on specialized knowledge within the scope of Rule 702, but rather is based upon a layperson's personal knowledge." *Id.*

The distinction between these two witnesses has been described as follows.

> The term 'expert witness' in Rule 26 refers to those persons who will testify under Rule 702 of the Federal Rules of Evidence with respect to scientific, technical, and other specialized matters. It does not encompass a percipient witness who happens to be an expert. The triggering mechanism for application of rule 26's expert witness requirements is not the status of the witness, but, rather, the essence of the proffered testimony. Accordingly, a party need not identify a witness as an expert if the witness played a personal role in the unfolding of the events at issue and the anticipated questioning seeks only to elicit the witness's knowledge of those events.

6 Moore's Federal Procedure § 26.23[2][a][i] (internal quotation marks, citations and footnotes omitted).

"In its purest form lay opinion testimony is based on the witness's observations of the event or situation in question and amounts to little more than a shorthand rendition of facts that the witness personally perceived. Lay opinion testimony is also

admissible when the inference is a conclusion drawn from a series of personal observations over time." Weinstein's Federal Evidence §701.03[1] (footnotes omitted).

"It is sometimes difficult to distinguish between a lay witness providing Rule 701 testimony and an expert providing testimony under Rule 702, particularly if the witness might otherwise qualify as an expert in his or her field... An essential difference is that Rule 701 requires direct personal knowledge of a factual matter at issue. Only then does it allow introduction of a limited degree of opinion testimony to help convey that information and only if the court finds that it would be helpful to the jury." 6 Moore's Federal Procedure § 26.23[2][a][i].

### Discussion

Before analyzing this matter further it is important to distinguish between the different areas of proffered testimony which both parties generally address as a single unit.

Defendants argue RESCH should be allowed to testify on three distinct yet related topics: (1) how the ECU functions, (2) how the data was downloaded from the ECU, and (3) what data was contained in the ECU of the vehicle subject to the complaint.

It appears evident that an explanation of "how" an ECU operates is the subject matter of expert testimony. This information derives

exclusively from formal education or specialized training not from ordinary personal observations.[26]

The same holds true on the mechanism available to retrieve the data stored in the ECU. Again, knowledge on the intricacies of getting this information interpreted so it can be read is not something characteristic of a lay person.

We now turn to the last and probably the most problematic item, that is, testimony regarding the information which appeared on the computer screen monitor once the ECU data was downloaded. According to defendant the proposed testimony constitutes RESCH's observations of the data downloaded from the ECU - corroborated by those present at vehicle inspection.

Plaintiffs aver that this testimony is not based on the deponent's personal knowledge but on the interpretation of the collection of data stored in the ECU after MR. RESCH downloaded the same.

The ECU memory recorded a crash at 903 hours and 45 minutes. The data downloaded through the computer regarding the faults and times is the information contained in the ECU. This information was not encrypted and was clearly displayed on the initial download computer screen shown to all those present during the initial

---

[26] The court recognizes that over a period of time some areas of specialized technical knowledge convert to common knowledge. However, we find that the intricacies of the retrieval and function of the ECU at this point in time are not within the purview of the average lay person.

CIVIL NO. 01-2596 (RLA)                                        **Page 29**

inspection. No test was necessary to elicit this information concerning the fault codes and the time.[27]

The question then becomes whether the fact that an electronic device was needed to interpret the recorded data makes the information produced the subject of expert testimony.

Assuming that the data displayed on the computer monitor constitutes a fact not requiring an opinion, and consequently, not the subject of expert testimony, the next question becomes whether defendant can present the exact time a crash was recorded by the ECU without previously laying any foundation as to how this information was computed and retrieved. As defendant itself argues, in order to assess the validity of plaintiffs' claims regarding the airbags' failure to deploy the jury must understand all three areas, that is how the ECU functions, how the data is downloaded and what that data contains. *See*, Rule 701(c). As we previously indicated this area of expertise cannot be addressed by a lay person. The fact that the program is owned by SIEMENS, RESCH's employer, is of no consequence if the program still requires an explanation of its operation by one with specialized knowledge.

---

[27]   Deposition Tr. 45.

### Conclusion

Based on the foregoing plaintiffs' Motion in Limine (docket No. **171**)[28] is **GRANTED**. Accordingly, ROBERT RESCH is excluded as a witness in this case.

### IV. ADEQUATE CAUSATION

Defendant has moved the court to enter summary judgment dismissing the products liability claims in this case for lack of evidence to establish causation. This is an action based on diversity jurisdiction. Accordingly, we shall apply Puerto Rico substantive law to dispose the issues presented. Collazo-Santiago, 149 F.3d at 25; Ganapolsky v. Boston Mut. Life Ins. Co., 138 F.3d 446, 448 (1st Cir. 1998).

### Strict Liability

The Puerto Rico Supreme Court has adopted a strict liability approach for claims arising from damages resulting from defective products. In Mendoza v. Cerveceria Corona, Inc., 97 P.R.R. 487, 499 (1969) the Supreme Court noted that "the most equitable rule and the one of greatest congruence with the public policy is that of establishing the manufacturer's strict liability to the consumer." See also, Aponte-Rivera v. Sears Roebuck de P.R., Inc., 144 D.P.R. 830, 838 (1998) ("The doctrine of strict liability of the manufacturer or seller for the damages caused by defective or

---

[28] See also, Opposition (docket No. **172**); Reply (docket No. **174**) and Sur-Reply (docket No. **176**).

dangerous products applies in our jurisdiction."); Rivera-Santana v. Superior Packaging, Inc., 132 D.P.R. 115, 125 (1992) ("In an effort to meet Puerto Rico's social needs, by judicial act, and as a question of public policy, we have laid down and adopted the manufacturer's strict liability rule for defective products.")

There are three types of defects which trigger application of strict liability principles. These are: manufacturing defects, design defects and defective warnings. Aponte-Rivera, 144 D.P.R. at 839-40; Rivera-Santana, 132 D.P.R. at 128; Montero-Saldaña v. Am. Motors, Corp., 107 D.P.R. 452, 462 (1978); Collazo-Santiago, 149 F.3d at 25; Caraballo-Rodriguez v. Clark Equip. Co., Inc., 147 F.Supp.2d 66, 71-72 (D.P.R. 2001).

For purposes of this case we are only concerned with an alleged manufacturing defect. There are no allegations in the pleadings regarding the design of the airbags at issue nor any claims of defendant's failure to provide adequate warnings. In essence, plaintiffs claim that the airbags did not deploy as expected.

A manufacturing defect is "'one that fails to match the average quality of like products, and the manufacturer is then liable for injuries resulting from deviations from the norm.'" Mendoza, 97 P.R.R. at 499 n.7 (citing Traynor, *The Ways and Means of Defective Products and Strict Liability*, 32 Tenn. L.Rev. 363, 367 (1965)). That is, "a manufacturing defect is present if the product differs from the manufacturer's intended result or from other ostensibly identical

units of the same product line." <u>Perez-Trujillo v. Volvo Car Corp.</u>,
137 F.3d 50, 53 (1ˢᵗ Cir. 1998) (citation and internal quotation marks
omitted); <u>Caraballo-Rodriguez</u>, 147 F.Supp.2d at 70. *See also*, <u>Aponte-Rivera</u>, 144 D.P.R. at 840 n.8; <u>Rivera-Santana</u>, 132 D.P.R. at 129 n.7;
<u>Montero-Saldaña</u>, 107 D.P.R. at 462.

### Proximate Cause

In Puerto Rico, in order to meet its onus under strict liability
principles "plaintiff has the burden of proving that the product was
defective and that said defect was the cause of the injury.[29] That is,

---

[29] In arguing the lack of causation in this case defendant has
made reference to a theory known as "crashworthiness", "second
collision" or "enhanced doctrine" which allows for recovery in cases
where the alleged product's defective design did not produce the
accident but either enhanced or caused damages beyond those resulting
from the initial collision. The "second collision" usually takes
place between an occupant of the car and some interior portion of the
vehicle after the initial impact. <u>Larsen v. Gen. Motors Corp.</u>, 391
F.2d 495 (8ᵗʰ Cir. 1968).
     This doctrine was initially adopted in <u>Larsen</u>, 391 F.2d at 503
where the court ruled that a "manufacturer should be liable for that
portion of the damage or injury caused by the defective design over
and above the damage or injury that probably would have occurred as
a result of the impact or collision absent the defective design" and
followed by <u>Dreisonstock v. Volkswagenwerk, A.G.</u>, 489 F.2d 1066 (4ᵗʰ
Cir. 1974). *See also*, <u>Whiteley v. Philip Morris, Inc.</u>, 11 Cal.Rptr.3d
807, 858 (2004) (defective design a "substantial factor" in enhancing
injuries).
     There has been extensive debate as to the required burden of
proof in enhancement cases. Some courts merely require that plaintiff
present evidence that the defective condition was a substantial
factor in bringing about the additional injuries. Thereupon, the
burden shifts to the manufacturer to apportion the damages between
those caused by the original collision and those attributable to the
defective product. If the damages are deemed indivisible the
manufacturer will be liable for the all of them. <u>Trull</u>, 187 F.3d at
100. *See also*., <u>Fox v. Ford Motor Co.</u>, 575 F.2d 774 (10ᵗʰ Cir. 1978)
(manufacturer is deemed a concurrent tortfeasor along with the person

plaintiff must show that the defective product was the legal cause of the injuries suffered." Aponte-Rivera, 144 D.P.R. at 839; Rivera-Santana, 132 D.P.R. at 126. "[P]laintiff must prove that (1) the product had a defect that made the product unsafe, and (2) the defect proximately caused the plaintiff's injury." Caraballo-Rodriguez, 147 F.Supp.2d at 70.

In Perez-Trujillo, 137 F.3d at 53), an alleged premature airbag deployment suit, the court summarized the prerequisites for a manufacturing defect cause of action as follows:

> Under Puerto Rico law, [plaintiff] must prove four essential elements: *viz.* (1) the [car] air bag had a 'manufacturing defect' of which [plaintiff] was unaware, (2) the defect made the air bag system 'unsafe,' (3) the usage to which the air bag was put by [plaintiff] was reasonably foreseeable by [the manufacturer], and (4) the defect proximately caused injury to plaintiff.

Perez-Trujillo, 137 F.3d at 53 (footnote omitted).

---

responsible for the original accident).

Other courts, however, place the onus on the plaintiff to distinguish between those injuries which would have resulted from the accident from those resulting from the enhancement. Trull, 187 F.3d at 101 and cases cited therein; Caiazzo v. Volkswagenwerk, A.G., 647 F.2d 241 (2nd Cir. 1981); Huddell v. Levin, 537 F.2d 726 (3rd Cir. 1976).

Apart from the fact that application of this doctrine has been limited to defective design cases, we find that we can dispose of this issue under Puerto Rico proximate cause principles without the need to resort to the mechanism suggested by defendant.

In order to prevail, plaintiff must establish that the defective product was "the cause" of the injuries complained of. <u>Malave-Felix v. Volvo Car Corp.</u>, 946 F.2d 967, 971 (D.P.R. 1991). *See also*, <u>Aponte-Rivera</u>, 144 D.P.R. at 847 (inadequate warning in defective product found to be "proximate cause" of accident).

Proximate cause requires that the damages complained of be either a direct result or a reasonably probable consequence of the act or omission at issue. In this case, the defective condition of the airbag system. Proximate cause is not every condition absent which the resulting damages would not have occurred but that which ordinarily causes them according to the general experience. <u>Baco v. ANR Const. Corp.</u>, 2004 TSPR 154; <u>Soc. Gananciales v. Jeronimo Corp.</u>, 103 D.P.R. 127, 134 (1974). Thus, in order to ascertain the cause of the damages plaintiff has to prove that defendant's omission is the one which most probably caused them. *Id*.

Adequate cause, parallel to proximate cause, is that which, in light of general experience, ordinarily produces the damages suffered. In other words, that which in the ordinary and normal course of events would have resulted in the occurrence of plaintiffs' damages. That is if, in retrospect, the damages complained of seem the reasonable and ordinary consequence of the act or omission complained of. <u>Colon v. Supermercados Grande</u>; <u>Baco v. ANR Const. Corp.</u>

Damages can result from the negligence of two or more persons. However, concurrent causes can come into play in different ways. There is the possibility of two or more persons acting in concert with each other and causing damages. There may also be two persons acting independently of one another but who coincide in causing a particular damage. Lastly, two persons acting independently but sufficiently contemporaneously of one another and one contributes to the aggravation of the damages caused by the other. Aquellos Aseguradores de Lloyd's London v. Pavarini Constr. Co., Inc., 126 D.P.R. 251 (1990). *See also*, Baco v. ANR Const. Corp.

When concurrent causes are present the decisive or efficient one is that which, based on the circumstances, determines the damages. Cardenas Mazan v. Rodriguez Rodriguez, 125 D.P.R. 702, 710 (1990); Valle v. Am. Int'l Ins. Co., 108 D.P.R. 692 (1979).

### Plaintiffs' Evidence

The parties agree that in this particular accident the airbag mechanism was supposed to have been activated. According to plaintiffs, the airbags' failure to deploy prompted the death of ALBA MARTINEZ. In other words, had the airbag worked as expected, decedent would have survived the car crash.[30]

---

[30] Even though plaintiffs contend that the failure of the airbags to deploy also caused her minor son's fractured femur, *see*, First Amended Complaint ¶ 18, no evidence has been submitted in support of this allegation.

CIVIL NO. 01-2596 (RLA)                                          Page 36

According to the applicable strict liability standard in this forum it is plaintiffs' burden to present sufficient evidence of causation for the trier of fact to conclude that the death of ALBA MARTINEZ was due to the vehicle's defective condition.

In order to establish damages causation in this case plaintiffs rely on the opinion of their only expert witness on liability, DR. RICARDO GALDOS, Ph.D, P.E., who provided forensic engineering services, and the fact testimony of DR. MARIA S. CONTE, the pathologist who conducted decedent's autopsy.

The report prepared by DR. GALDOS merely referred to the statistics vouching for the protection afforded by airbags in general but not to decedent's case in particular. In this respect in pertinent part the report reads as follows:

It has been well documented that air bags provide fatality protection in potentially fatal crashes. In a 1996 report to the United States Congress, the National Highway Traffic Safety Administration states that drivers protected by air bags experienced reduced fatality risk of 31 percent in purely frontal crashes and 19 percent in all frontal crashes... **[H]ad the air bags deployed Ms. Martinez would have had a greater statistical probability of surviving the collision.**

GALDOS December 31, 2001 Report p. 4 (emphasis ours).

CIVIL NO. 01-2596 (RLA)                                        **Page 37**

In his deposition DR. GALDOS acknowledged that he could not specify varying degrees of survival probability at different crash speeds. Rather, in rendering his report the expert's concern was basically to establish that the speed at the time of the accident was substantially above the threshold for mandatory airbag deployment. For DR. GALDOS the particular speed at the time of the accident was irrelevant.[31]

DR. GALDOS testified that the accident's Delta-V [32] was 35 to 48 miles per hour but that according to his own calculations the average was 39 to 40 miles per hour.[33] However, DR. GALDOS admitted that he had no knowledge as to the particular survival statistics in a 39 mile per hour BEV - his own average calculation of the speed of the accident - nor of specific statistics pertaining to survivability in non-deployment cases within either the 35 to 50 mile per hour range.[34] He could not opine whether airbag deployment could prevent

---

[31]   October 17, 2003 Deposition Tr. 100-102.

[32]   BEV, or barrier equivalent velocity "is the speed at which a vehicle goes into a barrier, measured in miles per hour." Quintana-Ruiz v. Hyundai Motor Corp., 303 F.3d 62, 65 (1st Cir. 2002).
    Delta V, a related but not identical concept, is the change in velocity of a vehicle, usually at the center of gravity, also measured in miles per hour. Generally, accident reconstruction experts measure the Delta V of the car environment, rather than that of a specific occupant. In accidents involving impact into a barrier, the BEV is often slightly less than the Delta V. The higher the Delta V is, the more serious the injuries are likely to be. Id.

[33]   September 9, 2003 Deposition Tr. 127, 143; October 17, 2003 depo. Tr. 99-102.

[34]   July 9, 2003  Deposition Tr. 128-31.

deadly injuries in crashes at speeds of 40, 42, 45 or 50 miles per hour.[35]

According to DR. GALDOS there are no studies addressing the crash survival rate at particular speeds. Rather, airbags are supposed to offer protection in severe crashes - which includes all accidents in excess of 25 miles per hour.[36]

Apart from this broad asseveration as to the benefits of the airbags in general at no time did DR. GALDOS indicate decedent's prospects of surviving the accident under the particular circumstances surrounding the crash. To the contrary, in his deposition DR. GALDOS acknowledged that he could not opine on this matter. In this regard, he specifically noted: "I think [decedent] struck the steering wheel. And had the airbag deployed, [it] would have helped slow down that motion... [but] whether or not slowing down would have prevented her death" he was not in a position to say.[37]

Additionally, DR. GALDOS conceded that the car had been involved in an "unusually violent impact"[38] and that the oncoming car had hit decedent's vehicle from a 20-25% angle left of center.[39] Further, he

---

[35]   October 17, 2003 Deposition Tr. 88.

[36]   July 9, 2003 Deposition Tr. 131.

[37]   October 17, 2003 Deposition Tr. 59.

[38]   *Id.* 85.

[39]   *Id.* 99-100.

was not able to testify whether, given the rotation of decedent's vehicle after impact, the airbag would have limited her movement within the car sufficiently to avoid her fatal injuries.[40]

The general proposition that statistically, airbags can save lives is not and cannot be disputed. However, plaintiffs cannot rely on this broad principle to meet their burden of proof in this case.

According to the autopsy report ALBA MARTINEZ died of "severe bodily trauma." Apart from certain lacerations and contusions, decedent had a fracture of the mandible and both legs, hemoperitoneum and splenic lacerations.

During her deposition plaintiffs' witness, DR. CONTE, noted that decedent's internal organs, including her lungs, pancreas, bowels and kidneys appeared normal.[41] Only the area of the spleen in the "left upper outer quadrant" appeared injured.[42] There was bruising in the area.[43] No head injuries were reported[44] nor did she sustain rib fracture.[45] There was also some bruising in the middle of the chest and in the axilla.[46] DR. CONTE could not inform "the precise point of

---

[40]   October 17, 2003 Deposition Tr. 59.

[41]   Deposition Tr. 25-26 & 30.

[42]   Deposition Tr. 28.

[43]   *Id*. 40.

[44]   *Id*. 23.

[45]   *Id*. 35.

[46]   *Id*. 40.

CIVIL NO. 01-2596 (RLA)                                        **Page 40**

impact at the jaw which caused [her] fracture"[47] nor her laceration

on her left part of her chin.[48]

     DR. CONTE explained that decedent died of a "hyperbolemic shock"

caused by "lost blood due to the spleen lacerations".[49] There was a

"collection of approximately 1000 cc of blood in the abdominal

cavity."[50]  According to the pathologist, the spleen is located "in

the left side of the body. Below the left breast, a few inches below

the left breast" and is considered part of the abdomen.[51] Further, she

indicated that the spleen injury "is mostly lateral."[52]

     All we know from her deposition testimony is the cause of death,

i.e., spleen lacerations. However, whether an airbag deployment would

have prevented these lethal injuries was not part of the evidence

provided by DR. CONTE.

### Conclusion

     Based on the foregoing, we find that there is no evidence for a

reasonable factfinder to conclude that the failure of the airbags to

deploy proximately caused the death of ALBA MARTINEZ. The opinion of

DR. GALDOS was based on general statistics but did not specifically

---

[47]   Deposition Tr. 45.

[48]   *Id.* 46.

[49]   *Id.* 31.

[50]   *Id.* 22.

[51]   *Id.* 19.

[52]   *Id.* 29-30.

CIVIL NO. 01-2596 (RLA)                                              **Page 41**

address whether, given the particular factors present in the accident at hand, it was the absence of airbags which proximately caused decedent's fatal injuries. In the context of this case the fact that ALBA MARTINEZ sustained mortal spleen lacerations by itself does not meet this standard. Neither did DR. CONTE address this particular causation issue. Her testimony was strictly limited to the clinical cause of death.

Additionally, the record is also devoid of any support to the claim that the non-deployment caused her son's fractured left femur.

Accordingly, HYUNDAI's Motion for Summary Judgment (docket No. **180**) is **GRANTED**[53] and the complaint filed in this case is hereby **DISMISSED.**

Judgment shall be entered accordingly.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 27th day of July, 2006.

S/Raymond L. Acosta
RAYMOND L. ACOSTA
United States District Judge

---

[53] *See also,* HYUNDAI's Memorandum of Law (docket No. **178**); Plaintiffs' Opposition (docket No. **183**); HYUNDAI's Reply (docket No. **194**) and plaintiffs' Sur-Reply (docket No. **208**).